In the
# United States Court of Appeals for the Fifth Circuit

◆

STATE OF MISSISSIPPI;
UNITED STATES OF AMERICA,

*Plaintiffs–Appellants,*

v.

JXN WATER,

*Defendant–Appellee*

◆

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

CITY OF JACKSON, MISSISSIPPI,

*Defendant.*

◆

On Appeal from the United States District Court
for the Southern District of Mississippi, Northern Division
Case Nos. 3:12-cv-790 & 3:22-cv-686
The Honorable Henry T. Wingate

◆

## DEFENDANT-APPELLEE JXN WATER'S BRIEF

C. Mitch McGuffey
Spencer M. Ritchie
Malissa Wilson
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
(601) 960-8600

Frank Paul Calamita, III
AQUALAW PLC
6 South 5th Street
Richmond, VA 23219

*Counsel for Defendant-Appellant
JXN Water*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-60309
*State of Mississippi; United States of America*
*v.*
*JXN Water*

_____

*United States of America*
*v.*
*City of Jackson, Mississippi*

Pursuant to Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Counsel for Appellant United States of America**:

Todd Kim, Assistant Attorney General
John Smeltzer, Attorney
Karl Fingerhood, Attorney
Angela Mo, Attorney,
Ezekiel A. Peterson, Attorney
Mina Kim, Deputy Assistant General Counsel
*United States Department of Justice*
*Environmental & Natural Resources Division*

Sarah Merrill, Attorney
Virginia Henning, Attorney
*United States Department of Agriculture*

**Counsel for Appellant State of Mississippi**:

Lynn Fitch, Attorney General
Scott G. Stewart, Solicitor General
Justin L. Matheny, Deputy Solicitor General
Elizabeth Windsor Usry, Special Assistant Attorney General
*Mississippi Attorney General's Office*


**Counsel for Appellee JXN Water**:

C. Mitch McGuffey
Spencer M. Ritchie
Malissa Wilson
*Forman Watkins & Krutz LLP*

F. Paul Calamita, III
*Aqualaw, PLC*


**Person with an interest**:

- Edward "Ted" Henifin (sole stock owner of JXN Water, Inc.)


*/s/ Charles M. McGuffey*
C. Mitch McGuffey

*Counsel for JXN Water*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee JXN Water does not believe that oral argument is necessary as the District Court acted properly within its equitable discretion entering the order at issue and the order can be affirmed on the papers only. Nonetheless, JXN Water is happy to participate in oral argument if the Court deems it helpful towards deciding the appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF CONTENTS ..........................................................................iv

TABLE OF AUTHORITIES...................................................................vi

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE ..................................................................3

   I.   Factual and Procedural Background ................................................3

      A. Jackson's sewage crisis – Clean Water Act enforcement action by the United States. ...................................................................3

      B. Jackson's drinking water crisis – Safe Drinking Water enforcement action by the United States....................................4

      C. Interim stipulated orders; third party manager takes over the City's water and sewer systems. .................................................8

      D. Federal funds awarded. .............................................................10

      E. Financial woes of water and sewer systems; ITPM plan for rates. ............................................................................................11

      F. Court grants ITPM's motion for release of SNAP data; United States and State of Mississippi appeal. ....................................13

  II.  Legal Background .........................................................................16

SUMMARY OF THE ARGUMENT ......................................................18

STANDARD OF REVIEW....................................................................19

ARGUMENT ........................................................................................20

   I.   The District Court has jurisdiction over the State of Mississippi and, by extension, the State's agencies. .......................................20

A. The State unequivocally waived its Eleventh Amendment immunity by filing suit in federal court. ..........................................26

B. The State waived Eleventh Amendment immunity when MDEQ and MSDH agreed to the Court's authority. ....................................29

C. The State consented to personal jurisdiction by filing suit in federal court. ..................................................................................34

D. MDHS is a non-party without appellate standing. ....................39

II. This Court lacks appellate jurisdiction over this interlocutory appeal. ...........................................................................................41

A. The United States cannot articulate a serious harm because it has already complied with the Order. ........................................42

B. The interests articulated are speculative, unsupported, or belong to beneficiaries, not Appellants. ....................................44

C. The Order is effectively a discovery order ................................47

D. Without any "clear and indisputable" error, the petition for writ of mandamus must be denied. ....................................................49

III. The District Court properly concluded federal law permits disclosure of limited SNAP data to the ITPM. ..............................51

A. The United States and State of Mississippi offer definitions that are not apparent from the text. ........................................55

B. The statutory history supports the finding that the SNAP rate is a "federal assistance program." ............................................58

CONCLUSION ..........................................................................................61

CERTIFICATE OF SERVICE ..................................................................62

CERTIFICATE OF COMPLIANCE ..........................................................63

# TABLE OF AUTHORITIES

## Cases

*Adam v. Saenger*
303 U.S. 59 (1938) ............................................................... 35

*A-Mark Auction Galleries, Inc. v. American Numismatic Ass'n*
233 F.3d 895 (5th Cir. 2000) ......................................... 47, 48

*Anderson v. Hutson*
114 F.4th 408 (5th Cir. 2024) ....................................... 41, 42

*Cargill v. Garland*
57 F.4th 447 (5th Cir. 2023) ............................................... 57

*Cheapside Minerals, Ltd. v. Devon Energy Prod. Co., LP*
94 F.4th 492 (5th Cir. 2024) ............................................... 52

*EEOC v. La. Office of Cmty. Servs.*
47 F.3d 1438 (5th Cir. 1995) ............................................. 40

*Estrada v. Ahrens*
296 F.2d 690 (5th Cir. 1961) ............................................. 35

*Gardner v. New Jersey*
329 U.S. 565 (1947) ............................................................ 27

*Green v. Graham*
906 F.3d 955 (11th Cir. 2018) ......................... 28, 30, 31, 32

*Gunter v. Atl. Coast Line R.R. Co.*
200 U.S. 273 (1907) ............................................................ 27

*Henry v. Lake Charles Am. Press LLC*
566 F.3d 164 (5th Cir. 2009) ............................................. 42

*In re Deepwater Horizon*
793 F.3d 479 (5th Cir. 2015) ......................................... 41, 42

*In re JPMorgan Chase & Co.*
  916 F.3d 494 (5th Cir. 2019) ......................................... 49, 50

*In re Lloyd's Register N. Am.*
  780 F.3d 283 (5th Cir. 2015) ................................................ 49

*In re Occidental Petro. Corp.*
  217 F.3d 293 (5th Cir. 2000) ....................................... 49, 50

*In re S.C. Dep't of Parks, Rec., & Tourism*
  103 F.4th 287 (4th Cir. 2024) ........................... 28, 29, 31, 34

*In re Sessions*
  672 F.2d 564 (5th Cir. 1982) ................................................ 50

*In re Tullius*
  500 F. App'x 286 (5th Cir. 2012) ....................................... 48

*In re Volkswagen of Am., Inc.*
  545 F.3d 304 (5th Cir. 2008) ................................................ 50

*Karcher v. May*
  484 U.S. 72 (1987) ............................................................. 39

*Kimberly Regenesis, LLC v. Lee Cnty.*
  64 F.4th 1253 (11th Cir. 2023) ........................................... 39

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.*
  535 U.S. 613 (2002) .................................................... 27, 30

*Loper Bright Enter. v. Raimondo*
  144 S.Ct. 2244 (2024) ....................................................... 58

*Marino v. Ortiz*
  484 U.S. 301 (1988) ........................................................... 39

*Meyers ex rel. Benzing v. Texas*
  410 F.3d 236 (5th Cir. 2005) ............................................. 26

*Newby v. Enron Corp.*
  542 F.3d 463 (5th Cir. 2008) ............................................. 19

*PaineWebber, Inc. v. Chase Manhattan Priv. Bank (Switz.)*
260 F.3d 453 (5th Cir. 2001) ...............................................38

*Porter v. Warner Holding Co.*
328 U.S. 395 (1946) .................................................... 19, 61

*Rollins v. Home Depot USA*
8 F.4th 393 (5th Cir. 2021).......................................... 36, 37

*Searcy v. Philips Elecs. N. Am. Corp.*
117 F.3d 154 (5th Cir. 1997) .............................................40

*SEC v. Safety Fin. Serv., Inc.*
674 F.2d 368 (5th Cir. 1982) .............................................19

*SEC v. Stanford Int'l Bank, Ltd.*
112 F.4th 284 (5th Cir. 2024).............................................38

*Special Quality Alloys, Inc. v. Coastal Mach. & Supply, Inc.*
2023 WL 7412945 (S.D. Tex. Nov. 9, 2023) .........................37

*State of N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc.*
923 F. Supp. 651 (D.N.J. 1995) ..........................................29

*Texaco Inc. v. La. Land and Expl. Co.*
995 F.2d 43 (5th Cir. 1993) ...............................................48

*Texas v. Caremark, Inc.*
584 F.3d 655 (5th Cir. 2009) .............................................27

*Texas v. Google LLC*
2024 WL 1691623 (E.D. Tex. Apr. 15, 2024) ......... 27, 28, 32

*U.S. ORSPRPG v. R.R. Comm'n of Tex.*
898 F.3d 497 (5th Cir. 2018) .............................................33

*United States ex rel Eisenstein v. City of New York*
556 U.S. 928 (2009) .........................................................39

*United States v. Garcia-Flores,*
207 F. App'x 397 (5th Cir. 2006) .......................................49

*United States v. Marmolejo*
  89 F.3d 1185 (5th Cir. 1996) ............................................... 60

*United States v. Oakland Cannabis Buyers' Coop.*
  532 U.S. 483 (2001) ...................................................... 19, 61

*United States v. Zuniga*
  860 F.3d 276 (5th Cir.2017) ............................................... 36

*VanDerStok v. Garland*
  86 F.4th 179 (5th Cir. 2023) ........................................... 56, 57

*Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*
  913 F.3d 443 (5th Cir. 2019) .......................................... 46, 48

**Statutes**

28 U.S.C. § 1292(a)(1)............................................. 1, 45, 46, 47

31 U.S.C. § 1122(a) .......................................................... 66

31 U.S.C. § 6101 ............................................................. 66

31 U.S.C. § 6401 ............................................................. 66

31 U.S.C. § 7501 ......................................................... 62, 66

42 U.S.C. § 300g-2 ........................................................... 23

42 U.S.C. § 300j–1 ........................................................... 10

42 U.S.C. § 300j–12 .......................................................... 10

42 U.S.C. § 4601 ............................................................. 66

42 U.S.C. § 5121(b) .......................................................... 66

5 U.S.C. § 552a(a) ........................................................... 66

7 U.S.C. § 2011 ............................................................. 59

7 U.S.C. § 2013 ............................................................. 16

7 U.S.C. § 2020 ........................................................... 16

7 U.S.C. § 2020(e) ........................................ 17, 57, 63, 64

8 U.S.C. § 1255a(h) ...................................................... 66

Miss. Code Ann. § 43-1-19 ........................................... 17

Miss. Code Ann. § 49-17-43 ...................................... 22, 35

**Other Authorities**

Restatement (First) of Conflict of Laws § 83 (2024) .............. 35

**Treatises**

15A Charles A. Wright & Arthur R. Miller
 *Fed. Prac. & Proc.* § 3902.1 (3d ed. 1992) ........................... 44

16 Charles A. Wright & Arthur R. Miller
 *Fed. Prac. & Proc.* § 3922 (3d ed. 2024) ............................. 45

**Regulations**

7 C.F.R. § 271.1 ......................................................... 16

7 C.F.R. § 272.1 ......................................................... 16

# STATEMENT OF JURISDICTION

JXN Water agrees that the District Court possesses jurisdiction over these cases. JXN Water disagrees, however, that this Court has appellate jurisdiction over the District Court's interlocutory order. As will be explained below, the Order does not meet the 28 U.S.C. § 1292(a)(1) exception for appellate jurisdiction over an injunction, nor does it satisfy the requirements of the collateral order doctrine. Further, a writ on mandamus is inappropriate where there is no clear or indisputable error.

## STATEMENT OF THE ISSUES

1.    Did the District Court have subject-matter and personal jurisdiction over the Plaintiff State of Mississippi and, by extension, its agency, the Mississippi Department of Human Services?

2.    Does this Court have appellate jurisdiction over this interlocutory appeal where one Appellant has already complied with the District Court's Order and both Appellants fail to present any serious harm or important issue for review?

3.    Did the District Court act properly within its discretion in issuing an order finding the federal receiver's water and sewer rate providing discounted services for low-income residents was a "federal assistance program" and requiring disclosure of SNAP recipient information to the Interim Third-Party Manager for limited use in implementing that discounted rate?

# STATEMENT OF THE CASE

## I.    Factual and Procedural Background

### A. Jackson's sewage crisis – Clean Water Act enforcement action by the United States.

In 2012, the United States and the State of Mississippi brought a Clean Water Act (CWA) enforcement action against the City of Jackson (the City) in the Southern District of Mississippi, Case No. 3:12-cv-790 (CWA suit). ROA.28–46. The lawsuit alleged the City had violated and continued to violate the CWA and the Mississippi Air and Water Pollution Control Law (MAWPCL) by allowing substantial amounts of raw sewage to be discharged from the City's sewer system into waterways of the United States and the State of Mississippi and other properties. ROA.37–40.

The same day the CWA suit was filed, the parties submitted a proposed Consent Decree. ROA.47–155. The Court adopted and entered the Consent Decree in 2013. ROA.472–577. The Consent Decree submitted the parties to federal jurisdiction, bound all parties, and required the City to take remedial actions for its sewer system aimed at bringing the system into compliance with the CWA and the MAWPCL.

ROA.480. Indeed, the portion of the Consent Decree setting forth the City's required remedial actions is 52 pages long. ROA.489–541.

Under its terms, the Consent Decree may be terminated only when the United States determines the City has satisfied its obligations under the decree. ROA.567. As will be explained below, the Consent Decree was stayed in 2023, in favor of an alternative approach placing the utility into receivership. As of that time, the City had achieved minimal or no progress under the Consent Decree, remained in violation of the Clean Water Act and State law, and its sewer system had deteriorated further. ROA.2048–49.

### B. Jackson's drinking water crisis – Safe Drinking Water enforcement action by the United States.

Like its sewer system, the City of Jackson's water system has faced significant challenges for many years. Breaks in distribution lines have been frequent and, combined with treatment plant and equipment failures, have led to numerous water service outages and boil water notices, during which the City advises users to boil water prior to using it for drinking, cooking, preparing baby formula or medicine, washing dishes, or any other activity that could lead to water consumption. ROA.3019; ROA.3021–22. From 2017 through 2021, the drinking water

system experienced an average annual rate of 55 distribution line breaks per 100 miles of line. ROA.2873–74. By comparison, an industry benchmark goal is no more than 15 breaks per 100 miles of line per year. ROA.2873. Between May 2020 and November 2022, the drinking water system experienced over 340 boil-water notices. ROA.3022.

In 2020, the United States Environmental Protection Agency (EPA) issued an Emergency Administrative Order to the City regarding its water system. ROA.2929–43. In the Emergency Order, the EPA determined that existing conditions in the System presented an imminent and substantial endangerment to people served by the System, giving rise to the potential presence of, *inter alia*, E. Coli, cryptosporidium, and giardia in the drinking water. ROA.2933. Around this time, the parties in the CWA suit filed a Joint Status Report in the stating, "the EPA and the State of Mississippi, by and through its State Department of Health ("MSDH") have been engaged with the City regarding ongoing compliance issues." ROA.587. The Emergency Order was then followed by a 2021 Administrative Order on Consent. ROA.2947–68. The Consent Order included a comprehensive repair plan intended to address the numerous deficiencies in the water system.

ROA.2962–68. The City received several notices of noncompliance with the Safe Drinking Water Act (SDWA) from the EPA during this time. ROA.3132–54.

In late August 2022, excessive rainfall and flooding exacerbated the pre-existing problems in the City's water system. ROA.3017. A public health crisis resulted when the system was unable to deliver potable water to most of the 150,000 people it served. ROA.3017; ROA.3181; ROA.4924. There was no running water for basic drinking, hygiene, and safety purposes, such as washing hands, showering, flushing toilets, or fighting fires. ROA.3017; ROA.3181.

In response, the City's Mayor issued an emergency proclamation on August 29, 2022. ROA.3017; ROA.3181. On August 30, 2022, the Governor of Mississippi declared a State of Emergency in the City, and the Mississippi Department of Health (MSDH) declared a public drinking water supply emergency. ROA.3017; ROA.3181.

On August 30, 2022, The President of the United States also declared an emergency in the State of Mississippi related to the water crisis that same day and ordered federal assistance to supplement response efforts. ROA.3018; ROA.3181. The President's action

authorized the Federal Emergency Management Agency (FEMA) to coordinate disaster relief efforts. ROA.2888–89. FEMA established a Unified Command to combat the water crisis and staffed it with, among others, representatives from FEMA and the United States Army Corps of Engineers. ROA.3018; ROA.3182.

With the help of federal and state agencies, the City ultimately restored water service on September 6, 2022, but a boil water notice, first instituted on July 29, 2022, remained until September 15, 2022. ROA.3019; ROA.3181–82.

For over a week, the City's residents were largely dependent on bottled water and other alternative water sources supplied by federal agencies, the State, and the City. ROA.3017. Many schools and businesses had to close due to safety and public health concerns associated with lack of water service. ROA.3017.

On November 29, 2022, the United States brought an SDWA enforcement action against the City in the Southern District of Mississippi, Case No. 3:22-CV-686 (SDWA suit). ROA.2865–2969. After detailing the catastrophic events described above, the suit alleged that contaminants in or likely to enter the City's public water system

presented an imminent and substantial endangerment to human health within the meaning of the SDWA. ROA.2866. The suit further alleged that the City had violated various other requirements of the SDWA and several administrative orders the EPA had previously issued to bring the City's water system into compliance with the Act. ROA.2866.

### C. Interim stipulated orders; third party manager takes over the City's water and sewer systems.

On the same day the United States brought the SDWA action, the Court entered an interim stipulated order (Water ISO)—agreed to by the United States, the State of Mississippi, and the City of Jackson— appointing an interim third-party manager (ITPM) over the City's water system and its billing and collecting arm, the Water/Sewer Business Administration Division (WSBA). ROA.3179–3215. The Water ISO appointed Edward "Ted" Henifin as the ITPM. ROA.3186.

Under the terms of the Water ISO, the ITPM was given, *inter alia*, the "full power and authority" to "operate, maintain, manage and control" the water system and the WSBA. ROA.3187. The ITPM's power and authority over the System and the WSBA is subject only to the oversight of the District Court, and the ITPM was expressly named an officer and agent of the Court. ROA.3192–93. To carry out his duties

under the Water ISO, the ITPM established JXN Water, Inc., through which he and his agents operate. ROA.3264–71. Accordingly, the Water ISO was amended to include JXN Water, and both the United States and the State of Mississippi confirmed their consent to the amendment. ROA.3261. The Water ISO placed a stay on the SDWA suit, and the ISO remains in effect until the Court enters final judgment. ROA.3205–06.

Due to the success of the ITPM's work stabilizing the water system, the Court directed the parties, including the State, to negotiate a stipulated order to cede control of the sewer system as well. ROA.3308–09. Nearly a year after entering the Water ISO, with the consent of the United States and the State, the Court administratively consolidated the 2012 CWA suit with the 2022 SDWA suit on August 14, 2023. ROA.849–54. Soon thereafter, on October 5, 2023, the Court entered a stipulated order in the CWA suit (Sewer SO)—agreed to by the United States, the State of Mississippi, and the City—appointing Mr. Henifin as the ITPM over the City's sewer system. ROA.2047–2102. As with the Water ISO, JXN Water, Inc. is the entity through which he operates. ROA.2057.

The Sewer SO found that the ITPM appointment necessary because the City "had failed to achieve significant progress under the Consent Decree and . . . the City's Sewer System . . . deteriorated further" over the 10 years the Consent Decree was in effect. ROA.2049. The Sewer SO gave the ITPM the same power and authority over the sewer system as the Water ISO gave him over the water system. ROA.2058–59. As part of the Sewer SO, the Court stayed the 2013 Consent Decree. ROA.2086.

### D. Federal funds awarded.

Following the federal emergency declaration issued in August of 2022, a substantial amount of federal funding has been provided for both the water and sewer systems. This includes:

- $150,000,000 under section 1442(b) of the SDWA (42 U.S.C. § 300j–1(b));

- $450,000,000 under section 1452 of the SDWA (42 U.S.C. § 300j–12);

- $2,800,000 through an EPA State and Tribal Assistance Grant;

- $4,000,000 through an EPA Community Grant;

- $125,000,000 from the US Army Corps of Engineers under the Water Resources Development Act Section 219 program; and

- $46,000,000 in American Rescue Plan Act funds.

ROA.4963. These sources combine for approximately $778 million of federal aid, through statutory allocation and administrative grants, available to the ITPM to address the water and sewer systems' infrastructures and long-term viability of the systems. ROA.4964.

**E. Financial woes of water and sewer systems; ITPM plan for rates.**

In addition to the dilapidated condition of the City's water and sewer systems and the concomitant significant operational and maintenance problems, both systems suffer from major financial difficulties. ROA.1079–80; ROA.3036–37; ROA.4956–60. These financial difficulties have contributed to poor maintenance, limited capital improvements, and system failures. ROA.1079–80; ROA.3036–37; ROA.4956–60.

A major driver of the systems' financial difficulties is lost revenue caused by, *inter alia*, a low fee collection rate for services (56% as of June 2023) and the City's shrinking population. ROA.4924–28, 4930. In recognition of this, both the Water ISO and Sewer SO authorized the ITPM to, *inter alia*, **unilaterally** adjust the rates, rate structure, or fees of the water and sewer systems, without agreement by the City. ROA.2064 (Sewer SO); ROA.3191 (Water ISO).

After assuming control of the City's water and sewer systems, the ITPM determined that he must adjust water and sewer service fees and rates to effectively stabilize and ultimately repair the City's water and sewer systems. ROA.4962. The month the Sewer SO was entered, the ITPM was already meeting with the parties, including the Lt. Governor, the Governor, and State agencies, to discuss the proposed SNAP classification for the water and sewer rate. ROA.4862–63. As a result, the ITPM exercised his authority to adopt new water and sewer rates in November 2023. ROA.4964–66.

Under the adopted rates, recipients of the federal Supplemental Nutrition Assistance Program (SNAP) will pay $10 per month while other residential customers will pay a minimum bill of $40 per month. ROA.2247. The ITPM determined this new rate structure will place the City's water and sewer systems on firmer financial footing, as is necessary to end the water and sewer crisis. ROA.4932–34.

By creating a classification of ratepayers for SNAP beneficiaries, the ITPM sought to make water and sewer services affordable for the over-one-quarter of Jackson residents who live at or below the Federal poverty line. ROA.4925. The ITPM determined not only that was the

rate necessary for those low-income residents to have access to safe drinking water and appropriate sewer services, but also that their participation as active, non-delinquent, ratepayers was crucial for the entire systems' stability. ROA.4932–33. Moreover, the ITPM concluded that the tiered-rate structure would "increase revenue collections while reducing the cost and impact of collection efforts." ROA.4933.

The ITPM chose to use SNAP for the rate structure because the United States and the State already recognize SNAP recipients as eligible for nutritional assistance. ROA.4932. Furthermore, SNAP has substantially higher participation rates (71% of people eligible in Mississippi) than other income-based assistance programs which may struggle to achieve 30% enrollment. ROA.2252. The ITPM determined that linking the water and sewer rates to SNAP was the only effective way to rapidly enroll eligible households into the rates they could afford, and would actually pay, while stabilizing the operations and finances of the water and sewer systems. ROA.4933.

### F. Court grants ITPM's motion for release of SNAP data; United States and State of Mississippi appeal.

In spite of their discussions with the ITPM beginning at least in October 2023, the Mississippi Department of Human Services (MDHS),

the SNAP implementing agency in Mississippi, did not inform the ITPM that it would not provide the requested SNAP information until January 2024, over a month *after* the rates were adopted. ROA.4862. Seeking to implement the adopted and necessary water and sewer rate structure, the ITPM was forced, on March 5, 2024, to move the District Court for an Order requiring disclosure to him of the current and future lists of Jackson SNAP recipients. ROA.2245–53.

The ITPM intended to use the recipient list to cross reference them with water and sewer customer lists to identify the customers eligible for the discounted SNAP rate classification. ROA.2248. The ITPM asserted that the tiered rate program with the SNAP rate classification constituted a "Federal assistance program," a status which, under federal law, would permit disclosure of SNAP recipient information to JXN Water. ROA.2248–51. The ITPM's motion requested the District Court to direct the release of the SNAP information, subject to data and security protocols and to an appropriate confidentiality agreement. ROA.2250. The United States and the State of Mississippi opposed the motion. ROA.2261–76 (United States response in opposition), ROA.2278–80 (MDHS letter).

On April 16, 2024, the Court entered an Order (the "SNAP Order" or the Order) granting the ITPM's motion. ROA.2376–79. The District Court found, factually and legally, the ITPM's use of the SNAP recipient classification for its water and sewer rate structure met the "Federal assistance program" exemption for release of the SNAP information. ROA.2379. The District Court further explained:

> The prompt implementation of the [ITPM's] rate schedule is critical to ensuring that residents pay equitably for public drinking water and sewer services. Being able to efficiently ensure SNAP-recipient ratepayers are properly classified under the new water/sewer rate schedule will help to minimize any service disconnections due to nonpayment of higher bills and help ensure the long-term financial viability of the Jackson water/sewer utility with the full participation of the SNAP-recipient ratepayers.

ROA.2378. Accordingly, the Court ordered the United States and the State, through their SNAP implementing agencies, to provide the SNAP information to the ITPM under an appropriate confidentiality agreement agreed to by the United States no later than April 30, 2024. ROA.2379.

Thereafter, on June 14, 2024, the United States and the State of Mississippi filed notices of appeal over the SNAP Order. ROA.2470–76 (United States notice), ROA.2468–69 (State notice).

## II. Legal Background

Congress established the SNAP program via the Food and Nutrition Act (FNA) to allocate funds for states to disburse among eligible households to purchase nutritious food. 7 U.S.C. § 2013. To participate, states (through implementing agencies) must provide a plan of operation for their SNAP program and are required to administer their program in line with regulations of the Food and Nutrition Service within the United States Department of Agriculture (USDA). 7 U.S.C. § 2020(a), (d); *see also* 7 C.F.R. § 271.1, *et seq*.

Pursuant to the FNA, state agencies implementing SNAP must establish "safeguards which prohibit the use or disclosure of information obtained from applicant households[,]" but:

> (A) The safeguards shall permit-
>
> > (i) **the disclosure of such information to persons directly connected with the administration or enforcement of** the provisions of this chapter, regulations issued pursuant to this chapter, **Federal assistance programs**, or federally-assisted State programs . . . .

7 U.S.C. § 2020(e)(8)(A)(i) (emphasis added); *see also* 7 C.F.R. § 272.1(c)(1) ("Use or disclosure of information obtained from SNAP applicant or recipient households shall be restricted to . . . [p]ersons

directly connected with the administration or enforcement of the provisions of the Food and Nutrition Act of 2008 or regulations, other Federal assistance programs, [or] federally-assisted State programs providing assistance on a means-tested basis to low-income individuals").

The Mississippi Department of Human Services (MDHS) administers the SNAP program in Mississippi. The Mississippi Code allows for disclosure of SNAP information in accordance with federal regulations. *See* Miss. Code Ann. § 43-1-19.

# SUMMARY OF THE ARGUMENT

I.     This Court should reject the State of Mississippi's argument that the District Court lacked subject-matter and personal jurisdiction over the Plaintiff-Appellant State of Mississippi and MDHS. The State, and MDHS by extension, waived its Eleventh Amendment immunity by filing suit and by consenting repeatedly, through other State agencies, to the District Court's jurisdiction.

II.     This Court lacks jurisdiction over this appeal because the District Court's Order does not meet the exception for appellate jurisdiction over interlocutory orders found in 28 U.S.C. § 1292(a)(1), nor does it satisfy the requirements of the collateral order doctrine. The harms cited by Appellants to justify appellate jurisdiction are purely speculative and based on a misunderstanding or a misstatement of the Order.

III.     This Court should affirm the District Court's Order. The ITPM's water and sewer rate, seeking to provide clean, affordable water to low-income households, constitutes a "Federal assistance program" under one of the FNA's exceptions to the general prohibition against disclosing SNAP information. The rate schedule is a program adopted by a federal agent pursuant to a federal court order in response to a federal disaster

declaration that advances Congress' purposes for the FNA and is supported by significant federal aid. Accordingly, the District Court properly ordered disclosure to the ITPM.

## STANDARD OF REVIEW

This Court reviews the actions of a district court sitting in equity for abuse of discretion. *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982). The Court reviews the actions of a district court in granting an injunction under the same standard. *Newby v. Enron Corp.*, 542 F.3d 463, 468 (5th Cir. 2008).

The United States Supreme Court has ruled that "when district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001). This discretion exists so district courts have the freedom to account for the "necessities of the public interest" when fashioning equitable relief. *Id.* Therefore, "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

# ARGUMENT

## I. The District Court has jurisdiction over the State of Mississippi and, by extension, the State's agencies.

In an appeal noticed by "Plaintiff the State of Mississippi" [ROA.2468] and filed by "Plaintiff-Appellant State of Mississippi" [App. Br., Dkt. 55 at 1][1], the State boldly attempts to recast this as an appeal by the Mississippi Department of Human Services. Indeed, in arguing that the District Court lacked both subject-matter and personal jurisdiction, the State makes only passing references to itself but appears to claim that MDHS enjoys sovereign immunity and personage entirely separate from the State. Of course, the State filed suit as a *plaintiff* in this federal-court matter, consented to the federal court's jurisdiction through a Consent Decree and two subsequent stipulated orders, and has repeatedly participated in this case, as expected and agreed. Moreover, this appeal involves an Order commanding *the State* (through its implementing agency) to provide information to the ITPM. *See* ROA.2379. Even co-Plaintiff-Appellant the United States concedes, "That order is . . . directed to [the] part[ies]," not the USDA or MDHS. [App. Br., Dkt. 53 at 33].

---

[1] References are made to the docket pagination, not the internal page numbering.

This matter began, in earnest, nearly 12 years ago when the United States and the State of Mississippi filed the CWA suit. ROA.28–46. From the outset, the State of Mississippi represented that "[the Mississippi Department of Environmental Quality] has the authority to bring this suit *on behalf of the State of Mississippi* in accordance with Miss. Code Ann. [§ 49-17-43]." ROA.29 (¶ 3) (emphasis added). Section 49-17-43(2) states that MDEQ has "power to institute and maintain *in the name of the State* any and all proceedings necessary and appropriate to enforce [the MAWPCL]." (Emphasis added).

Along with the Complaint, "the United States of America . . . and the State of Mississippi" with the consent of the City lodged a proposed consent decree. ROA.47–49. The State made clear, "Plaintiff, the State of Mississippi . . . joined in the Complaint and seeks injunctive relief and civil penalties." ROA.53. The Parties agreed, first, "[t]his Court has jurisdiction over the subject matter of this action . . . and over the Parties" and, second, "[t]he obligations of this Consent Decree apply to and are binding upon the United States, the State, and upon the City." ROA.56–57. For clarity, the Consent Decree defined the "State" to mean

"the State of Mississippi *including all of its departments, agencies, and instrumentalities*." ROA.64 (emphasis added).

Years later, in 2021, after little progress or no progress was made on the sewer system, the parties began discussing emerging issues with the City's water system and its non-compliance with the SDWA. In a Joint Status Report, the parties reported that, "the EPA and *the State of Mississippi, by and through its State Department of Health ("MSDH")* have been engaged with the City regarding ongoing compliance issues." ROA.587 (emphasis added). One year later, the United States filed the SDWA suit. ROA.2865–2906. That Complaint made clear, "The State of Mississippi . . . has primary enforcement responsibility for public water systems in Mississippi." ROA.2869 (citing 42 U.S.C. § 300g-2).

Along with the Complaint, the United States filed the Water ISO, citing 42 U.S.C. § 300g-2 [ROA.3180] which states, "a State has primary enforcement responsibility for public water systems." Mississippi meets that obligation through MSDH (the Health Department), but the State maintains primary enforcement responsibility under the SDWA. The State Health Officer and MSDH counsel, therefore, signed the Water ISO on behalf of the State and MSDH. ROA.3211.

Subsequent filings make clear that the State always was and was intended to be a party to both suits. In a joint motion, the United States and the City moved the District Court for a confidentiality order for settlement discussions. "[The ITPM] and the State of Mississippi, by and through [MSDH] and by and through [MDEQ], are expected to participate in . . . the United States and the City's settlement discussions. Thus, the ITPM and *Mississippi* are signatories to the proposed [confidentiality] Order and *agree to be bound by the proposed Order*." ROA.3243 (emphasis added). Almost every portion of the motion refers to "Mississippi," not a particular agency, and it represents, "The non-party signatories to the proposed Order—Mississippi, by and through MSDH and MDEQ, and the ITPM—have reviewed and consented." ROA.3246. A few weeks later, the United States and the State of Mississippi sought entry of a parallel confidentiality order in the CWA suit. That motion noted, "The State of Mississippi, through [MSDH], is a signatory to the [Water ISO]." ROA.650. Further, the motion was signed by "Attorneys for State of Mississippi," with signatures by counsel for MDEQ and MSDH. ROA.654.

When the Water ISO was amended, the State further clarified that it, not a particular agency, was participating. "The State of Mississippi, a non-party signatory to the Interim Stipulated Order, has reviewed and consented to the substance and form of the amendment." ROA.3261.

In May 2023, the Court directed the parties, including the State, to negotiate a stipulated order for the ITPM to control the sewer system. ROA.3308–09. In August 2023, the CWA and SDWA suits were consolidated, with the Court noting "the Parties agree to consolidation of these cases for administrative purposes." ROA.850. In discussing potential consolidation, counsel for the State clarified, "The State of Mississippi is actually the health department for the drinking water and DEQ for the sewer." ROA.2568. In other words, those agencies stood in the shoes of the State.

In October 2023, the Sewer SO was entered. ROA.2048–93. The State of Mississippi was a party to the Sewer SO. ROA.2048, 2093. During implementation of the Water ISO and the Sewer SO, MDHS (Department of Human Services) has partnered with the ITPM to administer other assistance programs. ROA.4926.

Around that same time, the ITPM was already meeting with the parties to discuss new service rates. No later than October 2023, the ITPM had met with Mississippi's Lt. Governor about the proposed SNAP customer classification and was in communication with counsel for MDHS about the rate. ROA.4863. The ITPM met with the Governor in November. ROA.4862. Yet, in January, MDHS informed the ITPM, *for the first time*, it would not provide the requested SNAP information. ROA.4862. This prompted the motion for SNAP information.

At a hearing which included a discussion of that motion, the State was represented by *six* different individuals from MDEQ, MSDH, and MDHS. ROA.2581–82. Counsel for MDHS conceded that he had been communicating with the ITPM "related to the proposed SNAP rate for some time now." ROA.2803. In a subsequent letter to the District Court, the State represented that MDHS's letter and appearance served as an "opposition" to the ITPM's motion. ROA.2466.

The Court issued its Order finding the ITPM's assistance program was a federal assistance program and ordering the United States and the State, through their implementing agencies, to provide the SNAP beneficiary information. ROA.2379. In a hearing following that Order,

the State was represented by four attorneys. ROA.2783–84. In that hearing, the United States clarified, "The SNAP program is administered by the states. . . . [S]o the State is the one that has the information." ROA.2803. The program may operate through MDHS, but it is *the State* that administers the program and possesses the SNAP recipient information. The State recognized that fact by telling the Court that an appeal would be necessary "to protect [the State] and its agencies." ROA.2466. In effect, the District Court ordered a party to provide information necessary to effectuate rate changes implemented by a federal officer, pursuant to the Water ISO and Sewer SO, that the ITPM deemed necessary for the financial viability of Jackson's water and sewer systems.

Shortly thereafter, the State filed its notice of appeal. ROA.2468.

## A. The State unequivocally waived its Eleventh Amendment immunity by filing suit in federal court.

The State of Mississippi, by filing suit and repeatedly consenting to federal court jurisdiction, waived its "Eleventh Amendment immunity," or "immunity from suit without consent in federal courts." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 241 (5th Cir. 2005). As the Supreme Court has explained, "A State remains free to waive its

Eleventh Amendment immunity from suit in a federal court." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002). As this Court has stated bluntly, "When a state initiates a lawsuit, it waives its sovereign immunity to the extent required for the lawsuit's complete determination." *Texas v. Caremark, Inc.*, 584 F.3d 655, 659 (5th Cir. 2009); *Lapides*, 535 U.S. at 619 ("[A] State 'waives any immunity . . . respecting the adjudication of' a 'claim' that it voluntarily files in federal court.") (quoting *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947)); *Gunter v. Atl. Coast Line R.R. Co.*, 200 U.S. 273, 284 (1907) ("[W]here a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment.").

A recent case within this circuit analyzed almost the exact question at issue here. *Texas v. Google LLC* involved a case filed by the State of Texas (among others) where State agencies sought to avoid discovery by asserting Eleventh Amendment immunity. *See* 2024 WL 1691623, at *1 (E.D. Tex. Apr. 15, 2024), *report and recommendation adopted*, 2024 WL 1676211 (E.D. Tex. Apr. 18, 2024). The special

master reviewed *Lapides* and other Fifth Circuit cases and explained, "the State of Texas even more directly invoked federal jurisdiction by filing suit against Google." *Id.* at *2. Because Texas voluntarily invoked federal jurisdiction, the special master recommended denying the agencies' defense. *Id.* at *4.

This is so because, as other circuits have explained, "As an arm of the State, [the State agency] enjoys no independent immunity. Rather, its immunity derives solely from the State, the sovereign to whom the immunity belongs." *In re S.C. Dep't of Parks, Rec., & Tourism*, 103 F.4th 287, 292 (4th Cir. 2024), *petition for cert. filed* (U.S. Oct. 2, 2024) (No. 24-377); *Green v. Graham*, 906 F.3d 955, 961–62 (11th Cir. 2018) ("[S]overeign immunity belongs to the state, and only derivatively to state entities and state officials.").

In this appeal, the State of Mississippi ignores entirely its status as Plaintiff-Appellant. Instead, it attempts to focus solely on MDHS' actions. Whether MDHS specifically consented to federal jurisdiction is simply irrelevant. In short,

> The [Department of Human Services] cannot in one breath claim to be the alter ego[] of the State and as such share in all of the State's immunities, and in the next breath argue, in effect, that [it is] not the same State

which filed the suit in the first place, albeit through a different State agency.

*State of N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc.*, 923 F. Supp. 651, 664 (D.N.J. 1995). Put differently, "when the State waived its immunity by [filing suit], it 'nullified' any immunity defense that any of its arms, including [MDHS], could have otherwise asserted." *In re S.C. Dep't of Parks, Rec., & Tourism*, 103 F.4th at 292. When the State of Mississippi voluntarily filed suit in federal court, there was no Eleventh Amendment immunity left for MDHS to assert. To steal a line from the Fourth Circuit, "As [Mississippi] goes, so goes [MDHS]." *Id.*

## B. The State waived Eleventh Amendment immunity when MDEQ and MSDH agreed to the Court's authority.

Even if the State of Mississippi had not filed suit, MDEQ's and MSDH's consent to federal jurisdiction waived the State's Eleventh Amendment immunity. The State contends, without citation, "the fact that other state agencies invoked or consented to the district court's jurisdiction did not waive the Department's immunity." [App. Br., Dkt. 55 at 36]. Again without citation, the State asserts, "That other state agencies voluntarily submitted to the district court's jurisdiction fails to prove that the Department did so." [*Id.* at 34]. This argument reflects a fundamental misunderstanding of Eleventh Amendment immunity.

As an initial point, State agencies and entities *are* the State. For example, in the *Lapides* case, the Board of Regents of the University System of Georgia removed a state-law case to federal court then attempted to assert immunity from suit. *Lapides*, 535 U.S. at 616–17. The Supreme Court found the Board's action removing the case to federal court as the State's action. It explained, "the State . . . voluntarily agreed to remove the case to federal court." *Id.* at 620. The Eleventh Circuit emphasized this point:

> Indeed, when the regents of the University System of Georgia "joined in removing the case" brought against them by Paul Lapides, the Supreme Court took it for granted that removal was "the State's act."

*Green*, 906 F.3d at 962.

The Eleventh Circuit's opinion in *Green* also demonstrates that agents of the State may waive the State's immunity. That case involved removal of a case by two Alabama officers. Once in federal court, the complaint was amended to add a third officer (Graham), who never provided consent to removal. *Id.* at 958–59. Graham claimed Eleventh Amendment immunity. Reviewing the claim of the non-consenting officer, the court determined that state immunity was "unitary and

indivisible, so that a waiver by one state defendant waives it for all." *Id.* at 961. The court expounded:

> [W]ere Graham to contest that she is subject to suit in a federal forum, it would be one and the same party in interest—the State of Alabama—that both waived and asserted forum immunity in one and the same case.

*Id.* at 962. Accordingly, the removal by other State officers "waived Graham's forum immunity." *Id.*

The Fourth Circuit reached a similar conclusion earlier this year. It explained that, "the arm *is* the state, and the state is the arm." *In re S.C. Dep't of Parks, Rec., & Tourism*, 103 F.4th at 292 ("[T]he named party [SCDPRT] is the alter ego of the state."). Where a State's authorized agency brings a case in federal court, the State has waived its immunity for any other agency. This is because,

> He represents the *State*. . . . [H]e caused the *State* to become a party to the action . . . thereby invoking a federal court's jurisdiction and waiving the *State's* sovereign immunity. . . . [T]here is no immunity left for SCDPRT to assert.

*Id.* at 293–94. The special master in *Texas v. Google* made essentially the same point. "[A]s state agencies' sovereign immunity is itself derivative of a state's sovereign immunity, the fact that such agencies

may be organized separately from . . . other state agencies is of no import." 2024 WL 161623, at *2 (citing *Green*, 906 F.3d 961–62).

Here, the State concedes both MDEQ and MSDH have consented repeatedly to the District Court's jurisdiction and administration of the Water ISO and Sewer SO. Indeed, MDEQ has consented to federal jurisdiction for nearly 12 years. MSDH has been intimately involved in the SDWA suit, since its inception, and in both the discussions that yielded the Water ISO and implementation of the ISO. Moreover, technical and legal representatives for both agencies have been involved in the consolidated case for over a year.

In its brief, the State either misunderstands or misstates the import of two state agencies consenting to federal jurisdiction *in this case* and actively participating in ongoing discussions with the EPA, the City, and the ITPM. As the Supreme Court and other circuits have explained, the consent of an authorized State agency is the consent of *the State*, and the immunity the State asserts on behalf of MDHS is the same immunity waived by the State, "by and through" MDEQ and MSDH. Mississippi statutory law makes clear that MDEQ is authorized to bring suit (and therefore to consent to federal jurisdiction) on behalf

of the State. *See* Miss. Code Ann. § 49-17-43. Moreover, MSDH is the implementing agency for the SDWA. *See* ROA.3180. There is no argument those agencies exceeded their authority. As counsel said at a hearing, "The State of Mississippi is actually the health department for the drinking water and DEQ for the sewer." ROA.2568. The State is the arm, and the arm is the State.

The only case cited *near* the State's contention that a waiver by one agency has no impact on another is *U.S. ORSPRPG v. R.R. Comm'n of Tex.*, 898 F.3d 497 (5th Cir. 2018). That case involved claims filed *against* various State entities. The primary question was whether those entities were arms of the state, which is not at issue here. *See id.* at 501–02. Plaintiffs also argued the agencies waived immunity by "participating in CERCLA cleanup with the EPA." *Id.* at 502. There was no alleged participation in the suit prior to bringing claims against the agencies. Simply put, that case has nothing to do with the facts here.

In this case, the State consented to jurisdiction repeatedly by filing the suit and by explicitly consenting to the District Court's authority under the Water ISO and Sewer SO. MSDH and MDEQ likewise consented to jurisdiction by participating in the Water ISO and

Sewer SO, respectively, and by their ongoing participation. Moreover, MDHS (Human Services) has been involved with the ITPM implementing other assistance programs and were involved in the development of the SNAP classification used in the ITPM's new rate structure. In all aspects, the State, by its own action or through its arms, has waived Eleventh Amendment immunity. There is no immunity left for MDHS to assert. *See In re S.C. Dep't of Parks, Rec., & Tourism*, 103 F.4th at 294.

## C. The State consented to personal jurisdiction by filing suit in federal court.

Lastly, for all the same reasons, the State has consented to personal jurisdiction. In a last ditch effort, the State raises a claim that the District Court lacked personal jurisdiction over MDHS. Because the State is a Plaintiff and the court's Order directed to the State (through its implementing agency), this argument is unavailing. Moreover, the failure to raise it and the ongoing participation of the State both forfeit and waived a defense for lack of personal jurisdiction.

First, in a case where the plaintiffs were no longer in the United States, this Court reversed a dismissal for lack of personal jurisdiction.

*Estrada v. Ahrens*, 296 F.2d 690, 694 (5th Cir. 1961). This Court stated the import of filing suit,

> The Estradas are not defendants refusing to submit to jurisdiction and against whom a valid personal judgment could not be entered; they are plaintiffs invoking the jurisdiction of the court. . . . Here, the act of the plaintiffs in bringing suit automatically establishes consent to jurisdiction.

*Id.* (citing *Adam v. Saenger*, 303 U.S. 59, 68 (1938) ("The plaintiff having by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes . . . . It is the price which the state may extract as the condition of opening its courts to the plaintiff.")). In short, "A plaintiff by bringing an action subjects himself . . . to the jurisdiction of . . . the court in which the action is brought." Restatement (First) of Conflict of Laws § 83 (2024).

As discussed above, the State of Mississippi is the Plaintiff here. The State has consented to the jurisdiction of the court. The Order is directed to the United States and the State to have the implementing agencies provide SNAP information. *See* ROA.2379; [*see also* App. Br., Dkt. 53 at 33 (agreeing "That order is . . . directed to [the] part[ies]")].

The State contends that MDHS's failure to appear (separately) or to file a response in opposition control whether the District Court can order the State to provide information necessary for implementation of the ITPM's water and sewer rates. The State had notice of the ITPM's motion and could have filed a response. They opted not to do so; however, it is simply not true to pretend the State and MDHS did not participate in briefing. Indeed, a letter from the Attorney General's office concedes, "The United States opposed that motion. . . . So did the Mississippi Department of Human Services." ROA.2466 (citing MDHS' letter attached to the United States' opposition brief and MDHS' appearance at the February status conference). Moreover, the State and MDHS have not provided any case law supporting a contention that State agencies have personal jurisdiction separate from the State. The State, as Plaintiff, consented to personal jurisdiction.

Second, "[a] party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (citing *United States v. Zuniga*, 860 F.3d 276, 284 n.9 (5th Cir.2017)

("Failure to raise a claim to the district court 'constitutes a forfeiture, not a waiver, of that right for the purposes of appeal.")).

In this case, neither the State nor MDHS presented the personal jurisdiction argument for the District Court's consideration. Thus, the court had no opportunity to rule on or remedy the issue, if any. This Court "[does] not ordinarily consider issues that are forfeited because they are raised for the first time on appeal." *Id.* at 398. Declining to address this newly espoused argument will not result in "a miscarriage of justice" because the State of Mississippi has already consented to the District Court's personal jurisdiction. *Id.* There is "no principled basis" for addressing the forfeited argument here. *Id.* 398–99.

Third, even if this Court determines that personal jurisdiction over the State is insufficient and that the forfeit argument should be addressed in the first instance, the State and MDHS have waived this argument by participation. "The Fifth Circuit has recognized the 'well-established rule that parties who choose to litigate actively on the merits thereby surrender any jurisdictional objections.'" *Special Quality Alloys, Inc. v. Coastal Mach. & Supply, Inc.*, 2023 WL 7412945, at *2 (S.D. Tex. Nov. 9, 2023) (quoting *PaineWebber, Inc. v. Chase Manhattan*

*Priv. Bank (Switz.)*, 260 F.3d 453, 459 (5th Cir. 2001)); *SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 295 (5th Cir. 2024) ("[T]he touchstone of every waiver is *consent*. That is, the question is whether the defendant took some action that he knew or should have known would subject him to the jurisdiction of the court—thus expressly or impliedly consenting to that jurisdiction.").

Here, the State has been actively involved and has expressly sought affirmative relief from the District Court. *See* ROA.53 ("Plaintiff, the State of Mississippi . . . seeks injunctive relief and civil penalties."). Moreover, there has been repeated consent to the District Court's jurisdiction. As to MDHS, they have participated in implementing other ITPM assistance programs. They entered a letter in support of the United States' response in opposition to the motion for production of the SNAP information. For months, they communicated with the ITPM and the Governor's office related to the SNAP classification in the water and sewer rates. MDHS appeared at multiple court hearings on the SNAP classification and the ITPM's motion. In all, the State and MDHS have waived any argument that they are not subject to the personal jurisdiction of the District Court where the State filed suit.

**D. MDHS is a non-party without appellate standing.**

The State's brief contends that MDHS is the *actual* appellant (and subject of the District Court's Order), not the State. If that is the case, this appeal must be dismissed because MDHS, as a non-party, lacks appellate standing.

"The rule that only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment, is well settled." *Kimberly Regenesis, LLC v. Lee Cnty.*, 64 F.4th 1253, 1260–61 (11th Cir. 2023) (quoting *Marino v. Ortiz*, 484 U.S. 301, 304 (1988) ("[B]ecause petitioners were not parties to the underlying lawsuit, and because they failed to intervene for purposes of appeal, they may not appeal from the consent decree . . . .")) (collecting other cases). A party with appellate standing is "one by or against whom a lawsuit is brought." *Id.* at 1261 (quoting *United States ex rel Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009)). Alternatively, a non-party may intervene or substitute as a party. *Id.* (citing *Karcher v. May*, 484 U.S. 72, 77 (1987)).

Finally, this Court has explained that there is a third bucket for non-party standing in certain circumstances:

> A person who is not a party to the proceedings below generally cannot appeal the court's judgment. However,

courts have granted exceptions where the non-parties actually participated in the proceedings below, the equities weigh in favor of hearing the appeal, and the non-parties have a personal stake in the outcome.

*EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1442 (5th Cir. 1995) (internal citations omitted). This court reiterated and clarified the standard for appellate standing, stating "appeal is likely to be available . . . if the would-be appellant can show significant involvement with the judgment, plausible reasons for not becoming involved earlier, [and] *a risk that its interests will not be adequately protected by the parties*." *Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 157 (5th Cir. 1997) (citing 15A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 3902.1 (3d ed. 1992)) (emphasis added).

Here, MDHS is not a party and did not intervene. On that, the parties agree. The question is whether they are a non-party with appellate standing. The answer is no. By the State's assertions, MDHS did not participate in the District Court proceedings. They never entered an appearance, never filed a formal opposition to the SNAP motion, and never asserted the defenses raised here. Moreover, there was and is no "risk that its interests will not be adequately protected by the parties." *Id.* The State is a plaintiff in this case and could assert any

argument MDHS wanted to make, but apparently, the State did not do so.[2] If this Court agrees that MDHS is the appellant, it should dismiss for lack of standing to bring the appeal.

## II.  This Court lacks appellate jurisdiction over this interlocutory appeal.

The United States contends this Court has jurisdiction to review the District Court's Order under two theories. First, the United States argues this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the Order is an injunction that allegedly causes serious harm. Second, it contends this Court has jurisdiction pursuant to the collateral order doctrine. The State does not make any additional jurisdictional argument but adopts the United States' briefing.

---

[2] Moreover, MDHS (and the State) make a conflicting argument as to this Court's appellate jurisdiction. They contend the Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1); however, that section is limited to injunctions against a party. "A district court 'grants' an injunction when an action it takes is 'directed **to a party**, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought in the complaint in more than a temporary fashion.'" *Anderson v. Hutson*,114 F.4th 408, 415 (5th Cir. 2024) (quoting *In re Deepwater Horizon*, 793 F.3d 479, 491 (5th Cir. 2015)) (emphasis added). Injunctions directed to non-parties are generally not appealable under this section. *See* 16 Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 3922 (3d ed. 2024) ("Other orders, perhaps not directed to a party, afford some or all of the substantive relief sought in the action . . . but are not appealable."). In an effort to establish appellate jurisdiction, MSDH (or the State) argue that the Order is, in fact, an injunction, which is necessarily targeted to a party, which MSDH is not.

## A. The United States cannot articulate a serious harm because it has already complied with the Order.

This Court has made clear that "the conditions for appeal under the collateral order doctrine are 'stringent.'" *In re Deepwater Horizon*, 793 F.3d 479, 484 (5th Cir. 2015). In addition to requiring a conclusive determination of an issue separate from the merits of the case that is effectively unreviewable, this Court, at times, has categorized "importance" "as a discrete fourth requirement." *Id.* (citing *Henry v. Lake Charles Am. Press LLC*, 566 F.3d 164, 178–81 (5th Cir. 2009)).

"Just as it has done with the collateral order doctrine, the Court has 'approached [28 U.S.C. § 1292(a)(1)] somewhat gingerly lest a floodgate be opened' that permits immediate appeal over too many nonfinal orders." *Anderson v. Hutson*, 114 F.4th 408, 415 (5th Cir. 2024). Accordingly, "a party challenging an interlocutory order must show 'serious, perhaps irreparable, consequences,' because the § 1292(a)(1) 'exception is a narrow one.'" *Id.* (quoting *In re Deepwater Horizon*, 793 F.3d at 492).

The United States cannot show either serious harm or an important issue because it has *already complied with the Order*. On July 1, 2024 and October 1, 2024, the United States, on behalf of the

USDA, provided notice to the ITPM and the Court that it "does not have information responsive to the SNAP Order." ROA.2501–2505; ROA.5004–5007. The ITPM acknowledged that the United States does not have the list and agreed that the State does. ROA.2506–2507.

The United States articulates two potential harms:  (1) a possible chilling effect and (2) over-inclusive disclosure of SNAP beneficiaries. Those interests are discussed below; however, it is difficult, if not impossible, to understand how those harms are threatened *as to the United States*, when all parties agree the United States does not have the relevant list and it has already complied with the Order. In truth, the United States is making arguments on the State's behalf because it disagrees with the District Court's finding that the federal receiver's SNAP discount to the water and sewer rate is a federal assistance program. Moreover, the District Court's determination that the ITPM's rate incentive is a "federal assistance program" can be challenged after final judgment without affecting the United States. It does not have the SNAP list. Disagreeing with the District Court is not a serious harm or an important issue, and the United States appeal should be dismissed.

## B. The interests articulated are speculative, unsupported, or belong to beneficiaries, not Appellants.

As noted above, the United States identified two potential harms, a chilling effect and unnecessary disclosure. Although the State did not address jurisdiction, it did contend that, by complying with the Order, "the federal government may withhold millions of dollars in SNAP funding from the State." [App. Br., Dkt. 55 at 31]. Because the State is the only entity with the relevant information, it is the only party potentially affected by the SNAP Order.

As to the first, the "chilling effect" is entirely speculative. Even in the United States' formulation, disclosure of beneficiary information "*could* have a chilling effect on program participation" or "*could* deter others from enrolling in the program." [App. Br., Dkt. 53 at 34]. The Government does not cite anything in support of this proposition. It is just as likely that the SNAP rate would *encourage* program participation because it provides additional program benefits, providing clean water for 25% of the cost.

The second alleged harm, over-inclusivity resulting in additional disclosure, is a complete misrepresentation of the permissible use of the requested information. The United States contends JXN Water would

over-apply the rate and, thereby, potentially disclose beneficiary status to landlords, extended family, or roommates; however, the Order permits JXN Water to receive the information "for the sole and limited purpose of cross-referencing SNAP recipients against JXN Water's customer rolls." ROA.2377. Contrary to the United States' argument, JXN Water is not permitted to disclose beneficiary status where the beneficiary is not the ratepayer.

Finally, the State contends compliance with the Order potentially subjects the State to loss of *all* SNAP benefits. This ignores the fact that, "The United States supports the discounted rate." [App. Br., Dkt. 53 at 20]. In addition, the State does not cite any statutory support or case law that would permit the United States to revoke SNAP benefits from a State disclosing SNAP beneficiary information (1) to a federal assistance program, in compliance with federal law, or (2) in compliance with a court Order. Simply put, this is a strawman.

As to the privacy concerns, JXN Water makes two additional points. First, the alleged risks are overblown. The Order makes clear that the SNAP information can only be received pursuant to "an appropriate confidentiality agreement." ROA.2379. Thus, Appellants

have an opportunity (and obligation) to reach agreement with JXN

Water to establish appropriate confidentiality and protections from

impermissible disclosure. Moreover, the Court expressly held the list

"shall not be made public" and "is not subject to State or federal

freedom of information or public records acts." ROA.2379.

Second, the privacy concern belongs to the third-party beneficiary,

not the United States or the State. As *Vantage Health Plan, Inc. v.

Willis-Knighton Medical Center* makes clear, a non-party may have

appellate standing and jurisdiction to contest disclosure of its

confidential information. 913 F.3d 443, 448–49 (5th Cir. 2019)

(permitting Humana to appeal disclosure of confidential information).

Unlike this Order, that case involved the *public* release of the third

party's information; nonetheless, a SNAP beneficiary would almost

certainly have grounds to appeal this disclosure. Indeed, there are

Plaintiff-Intervenors, community organizations representing various

community members' interests. The Plaintiff-Intervenors have not

appealed. In any event, the State does not share the same grounds. It

has appeared in its own capacity, as regulator or implementing agency.

The State has not appeared in a *parens patriae* capacity, representing Mississippi citizens.

All of the interests articulated are either entirely speculative, a contortion of what the Order permits, or a non-existent risk. Moreover, the privacy risk does not belong to either Appellant. This Order does not fall within any "class of claims" that demonstrate a serious or irreparable harm or an important claim satisfying the requirements of the collateral order doctrine. Accordingly, the appeal should be dismissed.

## C. The Order is effectively a discovery order.

The SNAP Order is also a *discovery* order directed to parties "to accord some of the substantive relief sought in the complaint." [App. Br., Dkt. 53 at 33]. While Appellants object to the District Court's determination that the water and sewer rate is a federal assistance program, they also object to the court's order to provide information to the ITPM for implementation of the rates. However, "discovery orders do not constitute final decisions under § 1291 and are not immediately appealable." *A-Mark Auction Galleries, Inc. v. American Numismatic Ass'n*, 233 F.3d 895, 897 (5th Cir. 2000); *Vantage Health Plan*, 913 F.3d

at 449 ("Pretrial discovery order . . . to disclose potentially privileged material is . . . insufficient by itself to provide jurisdiction."); *Texaco Inc. v. La. Land and Expl. Co.*, 995 F.2d 43, 44 (5th Cir. 1993) ("[T]he general rule is that a discovery order incident to a pending action is not subject to appeal.") (collecting cases).

Likewise, a discovery order is not "an appealable collateral order under *Cohen v. Beneficial Indus. Loan Corp.*" *A-Mark Auction*, 233 F.3d at 898; *In re Tullius*, 500 F. App'x 286, 292 (5th Cir. 2012) ("well-settled rule in this circuit that discovery orders may not be appealed under the *Cohen* exception").

Here, the United States concedes the Order is directed to parties and relates to substantive relief sought in the complaint (aiding the water and sewer systems' financial well-being by increasing collections and providing clean water). There can be little doubt that the Order commands the parties to provide information necessary for implementation of the water and sewer rates. This is discovery, and the discovery order is not immediately reviewable. It should be dismissed.

**D. Without any "clear and indisputable" error, the petition for writ of mandamus must be denied.**

"[T]he writ [of mandamus] may issue only if [Appellant] has demonstrated a 'clear and indisputable right to the writ.'" *In re JPMorgan Chase & Co.*, 916 F.3d 494, 500 (5th Cir. 2019); *In re Occidental Petro. Corp.*, 217 F.3d 293, 295 (5th Cir. 2000) ("To obtain mandamus relief, Occidental must do more than prove merely that the court erred."). However, "[s]atisfying this condition 'requires more than showing that the district court misinterpreted the law.'" *In re JPMorgan Chase*, 916 F.3d at 500 (quoting *In re Lloyd's Register N. Am.*, 780 F.3d 283, 290 (5th Cir. 2015)).

While Appellants allege (incorrectly) that the District Court misinterpreted the statutory meaning of "federal assistance program," they do not allege anything clear or obvious. Indeed, as this Court has observed in other circumstances, "the district court could not have committed clear or obvious error" in interpreting a statute in the first instance, without "any case in which a court has interpreted the statute." *United States v. Garcia-Flores*, 207 F. App'x 397, 400 (5th Cir. 2006). As discussed in Section III, the District Court correctly

interpreted the statute; however, even if it erred, the court did not "clearly and indisputably err." *In re JPMorgan Chase*, 916 F.3d at 500.

Additionally, a writ is only appropriate when the "issue implicated have 'importance beyond the immediate case.'" *Id.* at 499 (quoting *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 319 (5th Cir. 2008) (en banc)); *In re Occidental*, 217 F.3d at 296 ("[T]he legal issue resolved . . . was one of significant precedential value, involving a question which is likely to recur in future cases."). This case does not involve such an issue. This is an entirely unique situation involving a public utility placed into federal receivership, managing hundreds of millions of dollars in federal support, providing an assistance program without municipal support or endorsement but providing clean water to the underserved community. The likelihood of this fact pattern recurring is near zero; thus, this question of statutory interpretation is not one "likely to recur" or having "importance beyond the immediate case."

Finally, a writ is only appropriate where "no adequate remedy" is available. *In re Sessions*, 672 F.2d 564, 566 (5th Cir. 1982). As discussed above, the United States has no real harm because it does not possess the SNAP list, but it would have every opportunity to appeal the

District Court's decision after final judgment. Likewise, the State can appeal this admittedly temporary arrangement in the normal course. For these reasons, the petition for writ of mandamus must be denied.

## III. The District Court properly concluded federal law permits disclosure of limited SNAP data to the ITPM.

If this Court determines that it has appellate jurisdiction, it should affirm the SNAP Order because the District Court did not err by ordering disclosure of the SNAP data for the ITPM to implement the water and sewer rate schedule. Indeed, because the ITPM is a federal receiver administering an assistance program supported by hundreds of millions of dollars in federal aid, the District Court concluded properly that the ITPM's rate schedule, providing safe and healthy water to low-income households, constitutes a "Federal assistance program" and that the FNA permits disclosure of the SNAP data to the ITPM.

The FNA expressly permits disclosure of SNAP to data to, *inter alios*, "persons directly connected with the administration or enforcement of . . . Federal assistance programs . . . ." 7 U.S.C. § 2020(e)(8)(A)(i). The term "Federal assistance programs" is broad, without qualification, and left undefined in the statute. Under a plain and simple reading of the statutory text and considering the objectives

of the statute, the ITPM's rate schedule qualifies. *See Cheapside Minerals, Ltd. v. Devon Energy Prod. Co., LP*, 94 F.4th 492, 499 (5th Cir. 2024) (explaining courts interpret "undefined terms according to their ordinary and natural meaning and the overall policies and objectives of the statute").

Here, following a federally-declared public health emergency, the federal government and the State invoked the jurisdiction of the federal court system pursuant to federal statute (the SDWA). With the blessing of the United States and the State of Mississippi, federal court entered stipulated orders appointing the ITPM, as a federal receiver over the public utility, and vesting him with full authority and control over the City of Jackson's water and sewer systems. The ITPM serves as a federal trustee and as an officer of the federal court, not the City. ROA.2988 (Water ISO, "the ITPM . . . shall have the status of officers and agents of this Court"); ROA.2069 (Sewer SO, same). Moreover, his efforts are aided by nearly $800 million in federal aid [ROA.4963], supporting not only the rebuilding of the water and sewer systems but also the long-term viability of the systems.

As to the water and sewer rates necessary for the system, the Water ISO and Sewer SO give the ITPM "full power and authority" to implement rate changes he deems necessary without approval by the City Council or the Mayor. ROA.2985–86 (Water ISO); ROA.2064 (Sewer SO). That is precisely what happened here. Acting pursuant to his federal authority, and without any action from the City, the ITPM established new water and sewer rates that included a discounted water and sewer rate for SNAP recipients.

Additionally, the ITPM's SNAP rate classification, discounting clean water and providing for the long-term availability of that water, promotes and would achieve the congressionally authorized policy objective of providing nutritional assistance to needy households. *See* 7 U.S.C. § 2011 (declaring policy of Congress to "promote the general welfare" and "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households"). Like the provision of food assistance through SNAP, which has included bottled water, assisting low-income residents in acquiring water and sewer services is necessary to safeguard their health and well-being.

Put simply, while the parties have worked well with the ITPM to stabilize and repair the water and sewer systems, in this appeal, *the ITPM* is the party seeking to provide nutritional assistance to low-income households, not the Appellants. JXN Water is seeking to comply with the Congressional purpose cited in the United States' brief, and it invites the parties to join in that effort.

While the water and sewer assets (the plants and pipes themselves) are still owned by the City, that should be of no consequence. The ITPM has full control of those assets. Moreover, under the plain text of the FNA's disclosure exception, the focus must be, simply, on whether there is an assistance program provided by a federal source. Here, there clearly is.

In short, a person on the street would understand an assistance program to provide clean water to low-income households, targeted to SNAP beneficiaries, administered by a federal receiver under the authority of a federal court, operating pursuant to a stipulation by the EPA, following a federally-declared emergency, and utilizing millions of dollars in federal aid, to be a "federal assistance program," within the plain meaning of the statute.

## A. The United States and State of Mississippi offer definitions that are not apparent from the text.

Appellants declare different meanings of "Federal assistance program," meanings that are unapparent from the text and involve multi-pronged tests not prescribed by Congress. First, the United States asserts that the term "refer[s] to assistance programs that are administered by the federal government and operate under laws passed by Congress, in contrast with those administered by state, county, or municipal governments." [App. Br., Dkt. 53 at 41]. Elsewhere, the United States adds additional prongs to the test, asserting the term encompasses "only means-tested programs," [*id.* at 30], and "national programs," [*id.* at 46].

The State of Mississippi offers a slightly different test, asserting that "'Federal assistance programs' meant programs that provide federal assistance or benefits administered through federal agencies as authorized by Congress or the President." [App. Br., Dkt. 55 at 28]. The State's definition differs from the United States in that the State believes the term encompasses programs authorized by *either* Congress *or* the President.

The fact that the United States and the State offer differing definitions of "Federal assistance programs" in and of itself severely undercuts their positions. At any rate, none of what Appellants assert appears in the text of the statute, and they provide no case law or statutory authority adopting their definitions.

Both the United States and the State also refer to a list maintained by the General Service Administration (GSA), a federal agency, to demonstrate the *types* of programs they contend "Federal assistance program" refers. But the contents of a list compiled by the GSA cannot govern the meaning of statutory text, *especially* when there is neither (1) a reference in the statute to the list nor (2) a reference in the list to the statute. Appellants offer no support for why the Court should link the two except that it yields their preferred result. Furthermore, Congress knows how to limit application of the term "Federal program" to only those programs found in the GSA list. *See, e.g.*, 31 U.S.C. § 7501(a)(6). But, it did not do so here. This Court should not add to the text of the statute what is not there. *See VanDerStok v. Garland*, 86 F.4th 179, 195 (5th Cir. 2023) ("If judges could add to, remodel, update, or detract from old statutory terms . . . we would risk

amending statutes outside the legislative process reserved for the people's representatives."). If this is a loophole or error, Congress is free to clarify the limitations of the statute. *Id.* (citing *Cargill v. Garland*, 57 F.4th 447, 461 (5th Cir. 2023)).

Reading the "Federal assistance program" exception in the context of the other exceptions provided by Congress to the bar against SNAP data disclosure further erodes Appellants' asserted meanings of the term. From those other exceptions it is clear Congress knew how to *very specifically* limit disclosure for particular purposes and programs. The Act permits disclosure of SNAP data to:

- "the Comptroller General of the United States for audit and examination authorized by any other provision of law" (7 U.S.C. § 2020(e)(8)(B));

- "local, State or Federal law enforcement officials for the purpose of investigating an alleged violation of this chapter or any regulation issued under this chapter" (7 U.S.C. § 2020(e)(8)(C)); and

- "agencies of the Federal Government (including the United States Postal Service) for purposes of collecting the amount of an overissuance of benefits . . . from Federal pay . . . or a Federal income tax refund" (7 U.S.C. § 2020(e)(8)(D)).

These narrowly-tailored exceptions suggest that Congress's broader and unqualified use of the term "Federal assistance programs" was

intentional and meant to encompass much more than Appellants assert, including programs like the ITPM's adopted rate schedule.

## B. The statutory history supports the finding that the SNAP rate is a "federal assistance program."

Finally, the United States asserts that "the statutory history of the Food and Nutrition Act confirms that the exception allowing disclosure of SNAP data to federal assistance programs applies to national programs that are authorized by laws enacted by Congress . . . ." [App. Br., Dkt. 53 at 46]. Ironically, this section of the United States's briefing weaves statutory history together with the regulatory history and implies they are one and the same. They are not. Here, Congress provided an ever-widening exception that the USDA's implementing regulations sought to narrow. [*See id.* at 46–48]. *See Loper Bright Enter. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) ("courts need not . . . defer to an agency interpretation of the law").

Contrary to the United States's argument, what the statutory history shows is Congress's intent to broaden the application of that exception by removing all limitations on disclosure tied to named programs or types of programs. Congress "gradually broadened the allowable disclosure of SNAP data" [App. Br., Dkt. 53 at 48];

meanwhile, the USDA consistently sought to impose non-statutory limitations on that disclosure.

The treatment of the term "Federal assistance programs" in another federal statute pertinent to this case also counsels against the Appellants' positions and in favor of affirming the SNAP Order. The emergency declaration issued by the President following the August 2022 water crisis in Jackson was issued under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act). The Stafford Act refers to the emergency disaster assistance provided by the federal government to states and local government following an emergency declaration as "Federal assistance programs." *See* 42 U.S.C. § 5121(b)(6). This definition does not comport with the the United States and the State's position limiting the definition of the same term. The Stafford Act's broad definition harmonizes with JXN Water's and the District Court's position and with the facts of this case.

Additionally, in numerous other instances, and unlike here, Congress has chosen to limit terms akin to "Federal assistance programs" to specific but, notably, varying definitions. *See* 5 U.S.C. § 552a(a)(12) (defining "Federal benefit program"); 31 U.S.C. § 6101(4)

(defining "domestic assistance program"); 31 U.S.C. § 7501(5), 31 U.S.C.

§ 1122(a)(1)(A), 42 U.S.C. § 4601(4) (defining "Federal financial

assistance");  31 U.S.C. § 6401(5) (defining "Federal award"); 8 U.S.C. §

1255a(h)(1)(A)(i) (defining "program of financial assistance furnished

under Federal law"). Congress did not so limit the term "Federal

assistance programs" for the SNAP disclosure exception at issue here.

Additionally, none of the varying definitions referenced above contain

Appellants' multi-prong tests for definition of "Federal assistance

programs," further undermining their positions.

Simply put, the text and history of the FNA, combined with other

statutory law, do not support Appellants' asserted meanings of "Federal

assistance programs." *At most*, Appellants arguments support only a

finding that the meaning of "Federal assistance program" is ambiguous.

*See United States v. Marmolejo*, 89 F.3d 1185, 1189 (5th Cir. 1996)

(finding ambiguous a federal bribery statute's undefined use of the

terms "Federal program" and "Federal assistance" but also finding that

the terms "should be construed broadly").  And in that case, with no

"clear" or "inescapable" statutory impediment, the district court, sitting

in equity, acted properly within its discretion. *See Oakland Cannabis*, 532 U.S. at 496; *Warner Holding*, 328 U.S. at 398.

## CONCLUSION

For the foregoing reasons, JXN Water respectfully requests that the Court affirm the District Court's Order. Alternatively, JXN Water requests that the Court deny the appeal for lack of jurisdiction.

Respectfully submitted,

*/s/ Charles M. McGuffey*
C. Mitch McGuffey
Spencer M. Ritchie
Malissa Wilson
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
(601) 960-8600
mitch.mcguffey@formanwatkins.com

Frank Paul Calamita, III
AQUALAW PLC
6 South 5th Street
Richmond, VA 23219

*Counsel for JXN Water*

Dated: October 21, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: October 21, 2024

/s/ *Charles M. McGuffey*
C. Mitch McGuffey

*Counsel for JXN Water*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,550 words, excluding parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016 in 14-poiny Century Schoolbook font.

Dated: October 21, 2024

*/s/ Charles M. McGuffey*
C. Mitch McGuffey

*Counsel for JXN Water*